**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Mary Ann Whipple
United States Bankruptcy Judge

**Dated: August 10 2009**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 09-32604 |
| | ) | |
| Keith E. Mauer and | ) | Chapter 7 |
| Peggy A. Mauer, | ) | |
| | ) | |
| Debtors. | ) | JUDGE MARY ANN WHIPPLE |

### MEMORANDUM OF DECISION REGARDING MOTION TO DISMISS

This case is before the court on the United States Trustee's ("the UST") motion to dismiss Debtors' Chapter 7 case for abuse under 11 U.S.C. § 707(b)(1) and (3) [Doc. # 11] and Debtors' response [Doc. # 20].[1] The court held a hearing on the motion that Debtors, their counsel and counsel for the UST attended in person and at which the parties presented testimony and other evidence in support of their respective positions.

The district court has jurisdiction over this Chapter 7 case pursuant to 28 U.S.C. § 1334(a) as a case under Title 11. It has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 84-1 of the United States District Court for the Northern District of Ohio. Proceedings to determine a motion to dismiss a case under § 707(b) are core proceedings that this

---

[1] Although the motion was also brought under § 707(b)(2), at the hearing, counsel for the UST stated he was proceeding only under § 707(b)(3).

court may hear and decide. 28 U.S.C. § 157(b)(1), (b)(2)(J) and (O).

Having considered the briefs and arguments of counsel and having reviewed the record in this case, for the reasons that follow, the UST's motion to dismiss will be denied.

## **BACKGROUND**

Debtors are married and have no dependents. Keith Mauer is 58 years old and is employed as a teacher at a local high school, which employment he described as stable. He also has a side business relating to patent illustrations that he conducts out of his home. Peggy Mauer is a residency coordinator for Toledo Hospital where she has been employed for 28 years. She also previously taught at Owens Community College where she earned $800 to $900 per month; however, her employment there has ended. Although Ms. Mauer did not state her age, Debtor's counsel represents, and the UST does not dispute, that Ms. Mauer is 55 years old, which is also consistent with the length of her employment at Toledo Hospital.

On April 22, 2009, Debtors filed a petition for relief under Chapter 7 of the Bankruptcy Code, stating that their debts are primarily consumer debts. Debtors' Schedule D shows total secured debt in the amount of $186,441. Their secured debts include $103,902 secured by a first mortgage on their home, which they value at $90,000, a home equity loan in the amount of $28,071 secured by a second mortgage on their home, as well as $21,000 secured by a time share in Orlando, Florida, and $25,016 secured by their 2005 Honda Odyssey.[2] Debtors have stated an intention to surrender the Orlando time share. Debtors' bankruptcy schedules also show unsecured nonpriority debts in the amount of $229,708, consisting of $133,149 in student loan debt for which they are solely responsible,[3] and $96,559 in credit card debt. Debtors have no priority unsecured debt.

Before filing their petition, automatic withdrawals of $640 per month from Debtors' bank account were made in payment of their student loan debt. Peggy Mauer testified that Debtors expect their student loan creditors to reinstitute the automatic withdrawals after they receive a Chapter 7 discharge. No payments for student loan debt are shown on Debtors' monthly budget as set forth on their Schedule I and amended Schedule J.

Peggy Mauer also testified that, after filing their petition, they ceased making the required $500 per

---

[2] Debtors' Schedule D also includes a debt in the amount of $8,452, which Debtors characterize as being secured by Ms. Mauer's 403(b) plan. This characterization, however, was rejected in *Eisen v. Thompson*, 370 B.R. 762, 768-72 (N.D. Ohio 2007), wherein the court held that a loan from a Chapter 7 debtor's retirement plan was not a "debt" for purposes of the Bankruptcy Code, let alone "secured debt."

[3] Although some of the student loan debt consists of plus loans obtained for their children's education, Debtor's are solely responsible for payment of those loans.

2

month payment on the Orlando time share that they had purchased in June 2008. At the time Debtors purchased the time share, they owed approximately $220,000 in unsecured debt. No payments on account of the time share are shown on Debtors' monthly budget as set forth on their Schedule I and amended Schedule J.

In addition to their home and the Orlando time share, Debtors' assets include a 2005 Honda Odyssey, a 1994 Honda Civic, and Peggy Mauer's interest in a 401(k) plan valued at $37,000 and a 403(b) plan, which, after deducting a loan of approximately $8,500 taken by her against the plan, had a value of approximately $10,500. Debtors' remaining assets are modest.

Debtors' Schedule I shows gross monthly income in the combined total amount of $6,593. This amount includes $445 per month earned by Keith Mauer in his patent illustrations business, which is only one-third of the average monthly amount earned in 2008. Their total income does not include any income from Peggy Mauer's employment at Owens Community College. Debtors state on Schedule I that it is impossible to know if she will be teaching there in the Fall and that "it appears that she will not." [Doc. # 1, Schedule I]. Their was no testimony at the hearing contradicting this statement or otherwise regarding the status of her part time Owens Community College job.

Debtors' net monthly income after payroll deductions totals $4,282. Their payroll deductions include deductions from Peggy Mauer's income of $55 for life insurance, $63 for disability insurance, and $246 under the general label of "insurance." The $246 insurance deduction appears to include approximately $95 for Peggy Mauer's purchase of a whole life insurance policy that also includes extended care benefits, which she testified she first obtained in January 2009.[4] In addition, $256 per month is deducted as a contribution to Peggy Mauer's 401(k) plan. Debtors also received income tax refunds for 2008 in the total amount of $1,872.

Debtors' amended Schedule J shows total monthly living expenses of $4,807, resulting in a shortfall of $525 per month. Their expenses include, among other things, mortgage expenses for a first and second mortgage of $990 and $235, respectively, transportation expenses of $450, charitable contributions in the amount of $259, additional life insurance expenses of $350, medical and dental expenses of $220, and

---

[4] The court notes that Debtors' Schedule I does not separately set forth the cost of the whole life policy. Although Peggy Mauer testified that $88 per pay period is deducted for the whole life insurance, her pay advices filed with the court and of which the court takes judicial notice, show a deduction of only $44 per pay period [Doc. # 3]. *See* Fed. R. Bankr. P. 9017; Fed. R. Evid. 201(b)(2); *In re Calder*, 907 F.2d 953, 955 n.2 (10th Cir. 1990); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1171-72 (6th Cir. 1979) (stating that judicial notice is particularly applicable to the court's own records of litigation closely related to the case before it). This amount plus deductions for insurance not otherwise itemized on Schedule I (*i.e.* medical, dental and prescription drug insurance) average approximately $246 per month as set forth on Debtors' Schedule I under the general label of "insurance."

3

expenses from the operation of Keith Mauer's patent illustration business in the amount of $135.[5] Notwithstanding this itemization, Debtors' testimony shows that some of these expenses are not accurate. Although Peggy Mauer testified that their monthly transportation expense for gasoline is approximately $110 and that the remainder of the $450 transportation expense reflects maintenance costs, she testified that they spent only $1,200 for maintenance of their vehicles in 2008 and approximately $500 over the past six months. It appears, therefore, that the maintenance portion of their transportation expense is only approximately $100 per month and that $210 is a more accurate calculation of their total monthly transportation expense. Peggy Mauer also testified that their actual charitable contributions include approximately $60 per month as payroll deductions and $300 in total since January 2009 to their church as payment on their pledged amount of $100 per month. As Debtors identify no other charitable contribution, and assuming Debtors will be making the $100 per month pledged contribution to their church going forward, their itemized monthly charitable contribution expense is overstated by approximately $100.

Peggy Mauer further testified that the $350 per month insurance expense on amended Schedule J is for premium payments on a $500,000 term life insurance policy for herself and a $350,000 term policy for her husband. She testified that these policies were obtained in order to address the large amount of debt they have incurred and the loss of income that would result in the event of the death of one of them.

In addition to the itemized expenses on amended Schedule J, Peggy Mauer testified that she pays $599 quarterly, or an average of $200 per month, on her loan from her 403(b) plan. With the adjustments to Debtors' transportation expense (subtract $240) and charitable contributions (subtract $100) as explained above, and the additional $200 per month 403(b) loan expense added, their monthly expenses total $4,667 ($4,807-$340 +$200), which exceeds their net income set forth on Schedule I ($4,282) by $385.

Debtors' fourth amended Form B22A calculating the means test shows that their annualized current monthly income at the time of filing this case was above the median income for a household of two in Ohio. According to Debtors' means test calculation, no presumption of abuse arose under 11 U.S.C. § 707(b)(2). The UST filed a timely motion to dismiss for abuse and is now proceeding only under § 707(b)(3) based on the totality of the circumstances.

## **LAW AND ANALYSIS**

---

[5] Because Keith Mauer works out of his home with respect to his patent illustration business, his business expenses claimed on his income tax return include a percentage of Debtors' mortgage payment and utility costs. His Schedule J business expense of $135 does not, however, include any portion of his mortgage or utility expense. He testified as to the expenses claimed on Schedule C of his 2008 income tax return, which amounts, less the claimed mortgage and utility expenses, average approximately $135 per month.

4

Where debts are primarily consumer debts, as in this case, the court may, after notice and a hearing, dismiss a Chapter 7 petition "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. § 707(b)(1). Under § 707(b)(3), in determining whether granting relief would be an abuse, the court is required to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A) and (B). This provision was added by Congress in 2005 as a part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Before BAPCPA, courts considered whether to dismiss a case for "substantial abuse" under § 707(b) based on the "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth Circuit explained that "substantial abuse" could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *Krohn*, 886 F.2d at 126. Congress incorporated this judicially created construct in § 707(b)(3). Although pre-BAPCPA case law applying these concepts is still helpful in determining abuse under § 707(b)(3), under BAPCPA Congress has lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse." *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007).

In this case, the UST does not argue that Debtors filed their petition in bad faith but instead contends that the totality of the circumstances show that Debtors are not needy and that they have the ability to repay a significant portion of their unsecured debt. The totality of the circumstances test allows the court to consider both prepetition and postpetition circumstances. *See U.S. Trustee v. Cortez (In re Cortez)*, 457 F.3d 448, 455 (5th Cir. 2006) ("Section 707(b) does not condition dismissal on the *filing* of bankruptcy being [an abuse] but rather on the *granting of relief,* which suggests that in determining whether to dismiss under § 707(b), a court may act on the basis of any development occurring *before* the discharge is granted."); *In re Mestemaker,* 359 B.R. 849, 855-56 (Bankr. N.D. Ohio 2007).

Debtors are "needy" when "[their] financial predicament warrants the discharge of [their] debts" in a Chapter 7 case. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004). Factors relevant to determining whether a debtor is "needy" include the ability to repay debts out of future earnings, which alone is sufficient to warrant dismissal under some circumstances. *Krohn*, 886 F.2d at 126. Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and

5

other necessities." *In re Bender*, 373 B.R. 25, 30 (Bankr. E.D. Mich. 2007); *In re Burge,* 377 B.R. 573, 577 (Bankr. N.D. Ohio 2007); *see Krohn*, 886 F.2d at 126. "Courts generally evaluate as a component of a debtor's ability to pay whether there would be sufficient income in excess of reasonably necessary expenses to fund a Chapter 13 plan." *Mestemaker*, 359 F.3d at 856 (citing *In re Behlke*, 358 F.3d 429, 435 (6th Cir. 2004)).

In arguing that Debtors have the ability to pay a significant portion of their unsecured debt, the UST asserts that there are multiple ways, each of which is modest but collectively are significant, in which Debtors can trim their budget in order to make funds available to pay their unsecured creditors. The court already addressed the charitable contribution and transportation expense adjustment to reflect actual expenditures as suggested by the UST. The UST also asserts that the life insurance premiums paid by Debtors are excessive and are not reasonably necessary expenses. The court agrees in part. While the court believes some life insurance may be appropriate, the court agrees that the $500,000 and $350,000 term policies on Debtors' lives are excessive. They have no dependents and their unsecured debt, which according to Debtors is the reason for the life insurance policies, could be addressed in a Chapter 13 case. The court nevertheless finds the whole life policy, which has no cash value at this time and which has an extended care benefit, is not unreasonable given Debtors' ages and general health. Accordingly, the court finds that for purposes of evaluating the totality of the circumstances, Debtors' $350 in monthly expense for the term life insurance policies should be eliminated.

Another means to generate funds to pay unsecured creditors suggested by the UST is for Debtors to adjust their monthly income tax withholdings. Given their 2008 income tax refunds of $1,872, such an adjustment could yield an additional $150 per month in take home pay. But, as discussed earlier, with adjustments reflecting actual expenditures for transportation and charitable contributions, Debtors' expenses exceed their income reported on Schedule I by $385. After further adjustments for additional income of $150 and even assuming total elimination of the $350 life insurance expense, Debtors' average monthly income will exceed expenses by only $115, which amount the court finds would not result in a significant payment to unsecured creditors even over 60 months.

The UST also argues that deductions from Peggy Mauer's income for voluntary monthly 401(k) plan contributions and her 403(b) loan payments should be considered income available to fund a Chapter 13 plan. In *Behlke*, the Sixth Circuit affirmed the bankruptcy court's decision dismissing a Chapter 7 case as substantial abuse of the provisions of that chapter, finding that the debtors' voluntary 401(k) contributions in the amount of $460 per month were not necessary for the maintenance and support of the debtors or their

6

dependents and, therefore, should be included as disposable income for purposes of determining their ability to pay their creditors out of future earnings. *Behlke*, 358 F.3d at 435-36. In so finding, the court considered the fact that the debtors had accumulated retirement savings as well as other personal and real property of potentially significant future value. *Id.* at 436. In *In re Tucker*, 389 B.R. 535 (Bankr. N.D. Ohio 2008), this court addressed the precedent established by *Behlke* and concluded that it, as well as the plain language of § 707(b)(3), requires consideration of the totality of the debtor's individual circumstances in determining whether a debtors' 401(k) contributions are reasonably necessary. *See In re Tucker*, 389 B.R. at 540-41 (citing *In re Beckerman*, 381 B.R. 841, 848-49 (Bankr. E.D. Mich. 2008); *In re Gonzalez*, 378 B.R. 168, 174 (N.D. Ohio 2007)). As one court stated, "[t]here is little reason for a 'fresh start' that will only be answered with a substantial incapacity to provide for oneself at retirement." *In re King*, 308 B.R. 522, 531 (Bankr. D. Kan. 2004). Therefore, debtors may seek bankruptcy relief while voluntarily saving for retirement if such savings appear reasonably necessary for the maintenance or support of the debtor or the debtor's dependents. *Hebbring v. U.S. Trustee*, 463 F.3d 902, 907 (9th Cir. 2006). Factors relevant to this determination include: (1) the debtor's age and time left until retirement; (2) the amount of the debtor's existing retirement savings; (3) level of yearly income; (4) overall budget; (5) amount of monthly contributions; (6) needs of any dependents; and (7) other constraints that make it likely that retirement contributions are reasonably necessary expenses for this particular debtor. *In re Beckerman*, 381 B.R. at 848 (citing *Hebbring,* 463 F.3d at 907, *Taylor,* 243 F.3d at 129-30).

In this case, Debtors' income is above the median income. Although Peggy Mauer has accumulated retirement savings of approximately $47,500, Keith Mauer has no retirement savings at all. Debtors live in a modest home in which they have no equity and have no significant assets to enhance their retirement savings. Although Debtors unwisely purchased a Florida time share one year before filing their petition, they have no equity in the property and intend to surrender it. Debtors' retirement, while not imminent as they could have ten years or more of productive work lives ahead of them, is a growing concern given the inadequacy of their retirement savings. Peggy Mauer's contribution of $256 is less than 4% of Debtors' income, and her 403(b) loan repayment of $200 is approximately 3% of their income, neither amounts of which are extravagant or unusual. *See In re Tucker*, 389 B.R. at 541. To interrupt their contribution to Peggy Mauer's 401(k) plan and repayment of her 403(b) plan loan for five years until the conclusion of a Chapter 13 plan will likely result in a diminished ability to provide for themselves in retirement. For these reasons, and given Debtors' ages, Keith Mauer's lack of any retirement savings and Peggy Mauer's inadequate retirement savings, the court finds the monthly 401(k) contribution and 403(b) loan repayment

7

to be reasonable and necessary. As the court stated in *Tucker*, "abuse of the provisions of Chapter 7 implies 'some sort of action that crosses over a line of appropriateness. It permits consideration of surrounding factors so that abusive use of repayment of retirement plan loans and additional contributions to retirement plans can be separated from legitimate uses.'" *Id.* at 540 (quoting *In re Vansickel*, 309 B.R. 189, 209 (Bankr. D. Kan. 2004)). "The mere mathematical ability to fund a Chapter 13 plan if contributions or loan repayments to a retirement account are not made is alone insufficient to find abuse of the provisions of Chapter 7." *Id.* at 541 (citing *In re Beckerman*, 381 B.R. at 849).

In determining whether granting Debtors relief under Chapter 7 would be an abuse, the court has also considered the fact that they both enjoy stable primary employment and regular income and are, therefore, eligible for adjustment of their debts through Chapter 13 since their debts are less than the statutory eligibility limits. *See* 11 U.S.C. §§ 109(e), 101(30). The court has also considered the fact that in a Chapter 13 case, Debtors may be able to propose a plan taking advantage of provisions under Chapter 13 that offer relief to financially distressed debtors, such as, if they retain their home, stripping off the second mortgage on their home under the authority of *In re Lane*, 280 F.3d 663 (6th Cir. 2002), should the facts support it, as they appear to from Debtors' Schedule D. While stripping off the second mortgage would relieve them of the second mortgage payment of $235 per month and, theoretically, make available additional funds that could be used to pay unsecured creditors, it would also negatively impact their income tax deductions and, therefore, their income tax refunds. If Debtors make all of the adjustments the court finds appropriate as discussed in this opinion, before any stripping off of the mortgage, including adjusting tax withholdings to provide them an additional $150 per month in take home pay, their monthly net income will exceed expenses by only $115. Given the likely effect of decreasing their income tax refunds, the stripping off of the second mortgage would, therefore, add approximately $28,000 to their unsecured debt without a significant benefit to unsecured creditors.

There is limited evidence regarding the availability of debtors' remedies under state law or relief that might be afforded through private negotiations that will result in a benefit to unsecured creditors. Debtors' statement of financial affairs shows that they paid an entity called Clean Sweep a total of $8,172, or "$681 for 12 months for clearing up credit." [UST Ex. 2-33 (Doc. # 1, SOFA Question 9)]. Although this action shows that Debtors tried to address their overall financial situation outside of bankruptcy before filing their Chapter 7 petition, there is no evidence that this effort was or could be helpful in addressing their overall financial situation going forward. As the UST bears the burden of proof on the motion, *see In re Gonzalez*, 378 B.R. at 172, the court will assume that there are no such state law remedies or private

8

negotiations that will assist in resolving Debtors' financial problems.

The court is troubled by Debtors' purchase of a Florida time share just one year before filing their petition and at a time when they admittedly already owed unsecured creditors approximately $220,000. But that purchase was made at a time when Debtors were enjoying significantly more income from both Keith Mauer's patent illustration business and Peggy Mauer's employment at Owens Community College. While not prudent, there is no evidence showing that Debtors were not meeting their debt obligations at the time.

The court also notes that, before filing their petition, automatic withdrawals of $640 per month from Debtors' bank account were made in payment of their student loan debt. Peggy Mauer testified that Debtors expect their student loan creditors to reinstitute the automatic withdrawals after they receive a Chapter 7 discharge. There is no showing, however, that such funds will be available for withdrawal. The student loan debt is not dischargeable, and Debtors will have to make some arrangements for the resolution of that debt or face involuntary collection efforts. That obligation, without a showing on the record of the ability to pay it and what those arrangements might be, is not a basis for finding in this case that Debtors could fund a Chapter 13 plan for the benefit of all of their unsecured creditors with the funds needed to pay the student loan obligation as argued by the UST.

## **CONCLUSION**

The evidence shows that Debtors are like many of the families that appear in this court. They have made some unwise financial decisions and lived beyond their means to some extent with the assistance of credit cards. But they were generally able to pay their bills and juggle their obligations until some financial shock occurred, in this instance the material reduction in Keith Mauer's side business income and the absence of Peggy Mauer's second job. Having reviewed the totality of the circumstances as presented in this case, the court concludes that the UST has not proven by a preponderance of the evidence that Debtors are not needy and, therefore, that granting them relief in this case would be an abuse of the provisions of Chapter 7. The court will enter a separate order in accordance with this memorandum of decision denying the United States Trustee's motion to dismiss.